IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| **RANDALL J. KEYSTONE,** )<br>Plaintiff ) <br> ) <br>v. ) <br> ) <br> ) <br> ) <br>**G.M. HINKLE, et al.,** ) <br>Defendants. ) <br> ) <br> ) <br> ) | Civil Action No.: 7:15cv00553 <br><br> **REPORT AND** <br> **RECOMMENDATION** <br><br><br> By: Pamela Meade Sargent <br> United States Magistrate Judge |

The plaintiff, Randall J. Keystone, ("Keystone"), an inmate incarcerated at Red Onion State Prison, ("Red Onion"), in Pound, Virginia, and proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging that the defendant prison officials,[1] all of whom are employees of the Virginia Department of Corrections, ("VDOC"), have been deliberately indifferent to a risk of serious harm to him, in violation of his Eighth Amendment rights, by subjecting him to bad air resulting from an improperly maintained ventilation system and excessive use of OC pepper spray without adequate ventilation in the C Building. Keystone seeks compensatory and punitive damages, as well as injunctive relief.[2] This case

---

[1] Keystone sues the following defendants: (1) G.M. Hinkle, the Regional Administrator of the VDOC; (2) Warden Mathena, the former warden at Red Onion; (3) W. Swiney, a Unit Manager at Red Onion; (4) S. Franklin, currently a Captain at Red Onion; and (5) Lee Taylor, the HVAC Co-Manager at Red Onion.

[2] Keystone previously filed motions for preliminary injunctive relief related to the alleged poor air quality at Red Onion. (Docket Item Nos. 17, 33.) Following an evidentiary hearing on July 7, 2016, the undersigned, in a Report and Recommendation, recommended that these motions be denied. (Docket Item No. 58.) By Order dated October 18, 2016, the court adopted the undersigned's Report and Recommendation, denying Keystone's motions for preliminary injunction. (Docket Item No. 89.)

1

is before the court on the Defendants' Motion For Summary Judgment, (Docket Item No. 77), ("Motion"). Keystone has timely responded to the Motion. (Docket Item No. 88, ("Response")). None of the parties has requested a hearing on the Motion, making it ripe for disposition. The Motion is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The undersigned now submits the following report, recommending that the court grant the Motion and enter summary judgment in favor of all of the defendants on Keystone's §1983 claims.

## I.   Facts[3]

Keystone alleges in his sworn Complaint that he has been housed at Red Onion since December 21, 2002. At that time, he was 39 years old and in good health. He claims that he was diagnosed with chronic obstructive pulmonary disease, ("COPD"), in 2006 by Dr. H. Smith, an institutional physician, and that he was diagnosed with a deviated septum in 2008, both of which hinder his ability to breathe. Keystone alleges that he stopped smoking in 2008 and that, as of 2010, the VDOC went tobacco-free. Keystone has been housed in the C Building at Red Onion for the previous three and one-half years. In October 2013, he was housed in the C2 Housing Unit. On October 11, 2013, he was moved to the C1 Housing Unit, where he remained until March 25, 2014, at which time he was moved to the C6 Housing Unit. Keystone remained there until April 24, 2014, at which time he

---

[3] On a motion for summary judgment, the court may review a number of materials to determine whether a genuine dispute of any material fact exists, including sworn testimony, affidavits, sworn pleadings, discovery responses and other materials contained in the record. *See* FED. R. CIV. P. 56(C).

2

was returned to the C1 Housing Unit. He testified at his July 7, 2016, evidentiary hearing, that he remained in the C1 Housing Unit.

Keystone alleges that the ventilation system at Red Onion has become diminished in its quality/quantity of air, due to both wear and tear and neglect. He claims that the system inducts 25 percent fresh air, with the remaining 75 percent being recycled air and that there are no windows that can be opened to the outside to get any additional fresh air. He claims that it has "reeked" in the C Building for years. Keystone states that this smell is due to several conditions, including inmates not bathing regularly, inmates throwing feces and urine in the vents, spreading it in their cells or on themselves or throwing it on other inmates or staff, inmates using the floor as a toilet and flooding their toilets, causing the dirty water to spill out into the pod and into cells, VDOC employees' refusal to repair broken toilets for up to a week, inmates' failure to keep their cells clean and not do their laundry regularly, VDOC employees' failure to adequately clean and disinfect cells prior to an inmate being placed there, malfunctioning shower vents, which result in hot, wet, germ-filled air rolling out from the showers and into the pod and inmate cells and failure to clean the showers thoroughly. Keystone claims that he was housed above the showers for a year and a half, during which time, he coughed up blood from the steady flow of contaminated air coming directly into the cell, which was on the same vent line as the showers. He further alleges that all of these things send "spores and pathogens" into the air and that, if you wipe a ceiling light with a wet sponge, you can actually smell the germs and viruses incubating there. Keystone also alleges that these things make the air "burn" his throat and lungs and make him produce mucous and cough day and night, due to his COPD.

He claims that he had to start using an inhaler in 2014 after being in a cell with malfunctioning vents, but VDOC employees would not move him or fix the vents. He claims that, although he filed two grievances[4] on this issue, they were not processed. Nonetheless, Keystone claims he exhausted this claim. He alleges these malfunctioning vents were exacerbating his COPD, resulting in headaches, excessive mucous production and shortness of breath. Keystone alleges there were other instances of vents malfunctioning, noting that this occurred in practically half of his cells. He stated that, most times, when he tried to file complaints, he was met with resistance and/or they got "lost," so he gave up and tried to put up with it. Keystone has provided the court with a copy of a regular grievance, dated June 8, 2014, in which he complained of the air vent by his cell door not working properly and, despite Lt. Day's representation two to three weeks previously that he would submit a work order, he had failed to do so. (Docket Item No. 4 at 3-4.) Keystone claimed that the malfunctioning vent was aggravating his health conditions. Keystone did not file an informal complaint, and he sent this grievance to the Regional Ombudsman instead of the appropriate department head. Therefore, this grievance was not logged. Keystone also has provided the court with a copy of a regular grievance, dated July 17, 2014, in which he again complained of malfunctioning air vents in the C6 Housing Unit which were exacerbating his COPD. (Docket Item No. 4 at 8.) This grievance was rejected at intake because Keystone no longer was housed in the C6 Housing Unit.

On September 11, 2013, Keystone filed Regular Grievance 13-REG-01175, complaining that Unit Manager Swiney had him moved into an "intensive-

---

[4] Although Keystone references these two grievances as Exhibits 2 and 3 in his Complaint, no exhibits were attached thereto. These exhibits are made part of the record, however, as attachments to his Verified Statement, found at Docket Item No. 4.

4

management pod" even though he was not an intensive-management status inmate. He claimed that this pod "stunk bad" of feces and other things and that this move aggravated his COPD and caused unnecessary suffering and further medical expenses. (Docket Item No. 4 at 26-27.) At the July 7 hearing, Keystone testified that he was in the C2 Housing Unit at the time he filed this grievance. (Docket Item No. 83-1 at 3-4.) Keystone claims he filed another grievance in October 2013 – Regular Grievance 13-REG-01253 – complaining that, while he was in the intensive-management pod, a cell extraction was conducted three cells down from him by Lt. S. Franklin. (Docket Item No. 4 at 31.) Keystone claims that the officers sprayed this inmate repeatedly with OC spray over an hour-long period and that, when this gas is used, it circulates throughout the ventilation system. According to Keystone, the officers did not turn on the exhaust fans per policy, and everyone was coughing very badly, including the correctional officers and himself. He claims he was in "agony," coughing and choking and producing mucous the entire time and for several hours later. He claims that, since that time, his condition has worsened considerably, causing him to seek medical attention at least 20 times for recurrent headaches, sinus problems and coughing. Keystone claims that Lt. Franklin knew he should not use that much OC spray and that the fans were supposed to be turned on.

Keystone references Regular Grievance 620-24320, (Docket Item No. 4 at 35), as an example of an incident where he was placed in a cell that had feces smeared in it and in the vent in retaliation for an incident with a correctional officer. He references Regular Grievance 620-27850, (Docket Item No. 4 at 40), as an example of an incident regarding the shower vents not producing enough air. He stated that this condition made the correctional officers and other staff sweat, but the "upper supervisors" would lie about it and fail to submit work orders. At

5

the July 7 hearing, Keystone testified that he had attempted to grieve the shower issue on two occasions, but these grievances did not get logged. He noted that one inmate, a mental health patient, "reeked" so badly, it made his eyes water, and fumes could actually be seen emanating from his cell door.

Keystone alleges that, in 2014, Unit Manager D. Turner and Building Lt. Day told him they were going to have the vents vacuumed out and retaped, but this never occurred. When Keystone attempted to file a grievance on this issue, they never sent it or the informal complaint back, so he could not appeal it.

Keystone also references Regular Grievance 620-25982, (Docket Item No. 4 at 47), in which he complained of excessive cigarette smoke coming into his cell for weeks/months in 2007. He stated that all segregation cells have been tobacco-free since before he arrived at Red Onion, but progressive housing was in the cell block next door, and great amounts of cigarette smoke was coming from there. This was causing Keystone headaches, coughing and mucous production and chest pains. As of 2010, the entire VDOC went tobacco-free so, he concedes that this is no longer a problem.

Keystone alleges there also is a problem with dust and particles from trash and feces coming in through the vents. He claims that the HVAC Department at Red Onion advised him it is coming from outside. Keystone alleges that he sent a request to the HVAC Department regarding the air filters. The HVAC Manager, A. Taylor, responded that all filters are changed every 90 days, but Keystone states he has no way of knowing this for himself. He stated that the conditions never get any better as they would if the filters were changed.

Keystone claims that he has had to flush his eyes and nostrils out a couple of times daily with water for years or he cannot breathe well. He also claims that he has been prescribed three different nasal sprays, but none seem to help, and he uses eye drops several times daily. Keystone claims he has an occasional nosebleed from sinus infections and that his deviated sputum is such that he can barely breathe out of one side of his nose. Also, the continual coughing up of mucous makes breathing difficult, and it sometimes causes him to lose his voice. Keystone stated that he has seen this occur with other inmates, as well.

Keystone alleges that, earlier in 2015, another inmate in the C5 pod, housed directly below him, threw and smeared feces daily for over a week, infecting the air so badly that Keystone developed a "red-spot rash" on his exposed skin. He was forced to move out of this cell. According to Keystone, former Building Lt. Gilbert told him he could not turn on the exhaust fans because it would make the cells too cold. He does not claim that he attempted to grieve this issue.

The defendants have submitted an affidavit from J. Messer, the Institutional Grievance Coordinator at Red Onion, in support of the Motion. (Docket Item No. 78-1, ("Messer Affidavit")). Messer stated that VDOC Operating Procedure, ("OP"), 866.1,[5] governs the mechanism by which offenders may resolve complaints, appeal administrative decisions and challenge the substance of procedures. (Messer Affidavit at 1.) She stated that all offenders are entitled to use the grievance procedure for problem resolution, and reprisals are not imposed upon them for filing grievances in good faith. (Messer Affidavit at 2.) Under OP 866.1, Messer stated that grievances are to be submitted within 30 calendar days from the date of the incident. (Messer Affidavit at 2.) However, prior to

---

[5] A copy of OP 866.1 is attached as Enclosure A to Messer's Affidavit.

submitting a regular grievance, the offender must demonstrate that he has made a good faith effort to informally resolve his complaint, which may be accomplished by submitting an informal complaint to the appropriate department head. (Messer Affidavit at 2.) Prison staff should respond to such informal complaints within 15 calendar days to ensure that the informal response is given prior to the expiration of the 30-day time period for filing a regular grievance. (Messer Affidavit at 2.) When filing a regular grievance, the offender must attach documentation to show that he attempted to informally resolve the issue. (Messer Affidavit at 2.) Only one issue per grievance form will be addressed, and grievances must be appealed through all available levels of review to satisfy the exhaustion requirement before filing a lawsuit. (Messer Affidavit at 2.) Grievances which are deemed to not meet the filing requirements of OP 866.1 are returned to the offender within two working days from the date of receipt with a reason for return on the intake section of the grievance form. (Messer Affidavit at 2.) The offender is instructed how to remedy any problems with the grievance when feasible. (Messer Affidavit at 2.) A copy is made of all grievances returned to the offender with the reason for return noted on the second page of the grievance form. (Messer Affidavit at 2.) If the offender wishes review of the intake decision on any grievance, he may send it to the Regional Ombudsman for a review. (Messer Affidavit at 2-3.) There is no further review of an intake decision. (Messer Affidavit at 3.)

If a grievance is accepted at intake, there are three levels of review available for regular grievances. (Messer Affidavit at 3.) Level I reviews are conducted by the Warden or Superintendent of the prison. (Messer Affidavit at 3.) If the offender is dissatisfied with this determination, he may appeal it to Level II. (Messer Affidavit at 3.) Level II responses are provided by the Regional Administrator, Health Services Director or Chief of Operations for Offender

8

Management Services. (Messer Affidavit at 3.) For most issues, Level II is the final level of review. (Messer Affidavit at 3.) For those issues appealable to Level III, the Deputy Director or Director of the VDOC conducts a review of the regular grievance. (Messer Affidavit at 3.) The time limit for issuing a Level I response is 30 days, and for Levels II and III, it is 20 days each. (Messer Affidavit at 3.) Expiration of any of these time limits without issuance of a response automatically qualifies the grievance for appeal to the next level. (Messer Affidavit at 3.)

Messer stated that, after reviewing Keystone's grievance file from October 2013 to October 2015 relative to claims of suffering chronic health problems due to poor air quality and inadequate ventilation system in his housing unit, she found two complaints that had been exhausted. (Messer Affidavit at 4-5.) She stated that Keystone had been assigned to the C6 Housing Unit since November 9, 2015. (Messer Affidavit at 4.) First, Keystone submitted Regular Grievance, ROSP-13-REG-01175, dated September 11, 2013, complaining that he was moved to the C2 Housing Unit in August and that the pod smelled due to inmates smearing fecal matter, inmates not bathing and the showers not being cleaned. (Encl. B to Messer Affidavit.) He claimed these conditions caused him to suffer headaches and aggravated his health conditions. (Encl B. to Messer Affidavit; Messer Affidavit at 4.) Keystone stated in this Grievance that he did not belong in the C2 Housing Unit, which was reserved for "intensive management" inmates, which he described as those inmates who are "seriously violent" and "crazy." (Encl. B. to Messer Affidavit.) Although Messer did not initially accept the Grievance on intake, for failure to provide sufficient information, it was eventually accepted, most likely, she stated, because Keystone asked her to review it again for intake purposes, after which she accepted it upon further review. (Messer Affidavit at 4.) At that time, it was assigned a log number. (Messer Affidavit at 4.) She informed Keystone that

9

if he disagreed with his current housing status, to attach his DOC 11-H form for review. (Messer Affidavit at 4.) Keystone appealed this decision, and Warden Mathena provided the Level I response on September 26, 2013, finding that his housing assignment was appropriate and that proper cleaning and sanitation procedures are followed in the C2 Housing Unit. (Encl. B. to Messer Affidavit; Messer Affidavit at 4.) Keystone then appealed this decision to Level II. (Encl. B. to Messer Affidavit; Messer Affidavit at 4.) G.M. Hinkle, the Regional Administrator, provided the Level II response on October 18, 2013, upholding the Level I response. (Encl. B. to Messer Affidavit; Messer Affidavit at 4.) At this point, Keystone's administrative remedies were exhausted on this issue.

Messer further stated that Keystone submitted Regular Grievance, ROSP-13-REG-01253, signed on October 10, 2013, complaining that the exhaust fans were not turned on prior to a cell extraction of another inmate, and he was forced to breathe in excessive amounts of pepper spray, which aggravated his COPD. (Encl. C to Messer Affidavit; Messer Affidavit at 5.) Warden Mathena provided a Level I response on October 17, 2013, finding that all procedures were properly followed with the decontamination of the C2 Housing Unit after the OC spray was utilized. (Encl. C to Messer Affidavit; Messer Affidavit at 5.) Keystone appealed this Level I response to Level II, and Regional Administrator Hinkle provided a response on October 30, 2013, upholding the Level I response. (Encl. C to Messer Affidavit; Messer Affidavit at 5.) At this point, Keystone exhausted his administrative remedies on this issue.

According to Messer, Keystone submitted another regular grievance, dated June 8, 2014, complaining that the air vent by his cell door was not working, which was exacerbating his COPD and sinus condition and causing headaches. (Encl. D

10

to Messer Affidavit; Messer Affidavit at 5.) He requested that this vent be fixed. (Encl. D to Messer Affidavit; Messer Affidavit at 5.) However, Keystone did not file an informal complaint, and he mailed the grievance directly to the Regional Ombudsman. (Encl. D to Messer Affidavit; Messer Affidavit at 5.) Therefore, he did not submit it through the regular grievance procedure, and Messer did not review it to determine if it met intake criteria. (Messer Affidavit at 5.) Keystone submitted another regular grievance, dated July 17, 2014, complaining that the exhaust vent needed to be reopened, and the air filters needed to be changed. (Encl. E to Messer Affidavit; Messer Affidavit at 5.) He claimed that the vents in his cell were not pushing/pulling out hardly any air, and it smelled badly, which aggravated his COPD. (Encl. E to Messer Affidavit.) Messer did not accept this grievance during the intake process and did not assign it a grievance number because the issue did not personally affect Keystone. (Encl. E to Messer Affidavit; Messer Affidavit at 5.) Messer wrote this reason on the back of the grievance on July 21, 2014, noting that Keystone was no longer housed in the C6 Housing Unit, and she returned the grievance to him. (Encl. E to Messer Affidavit; Messer Affidavit at 5.) Keystone appealed the intake decision to the Regional Ombudsman who upheld the decision on August 6, 2015. (Encl. E to Messer Affidavit; Messer Affidavit at 5.)

Messer stated that, aside from these grievances, she was unaware of any others that Keystone filed or attempted to file during the period of time she reviewed regarding the air quality in his housing unit. (Messer Affidavit at 5.) Therefore, she stated that the last properly filed and exhausted grievance on this issue, is the Regular Grievance submitted on September 11, 2013 – ROSP-13-REG-01175. (Messer Affidavit at 5-6.) She further stated that she was unaware of any other grievances Keystone filed or attempted to file regarding the use of OC

spray in his housing unit. (Messer Affidavit at 6.) The last properly filed and exhausted grievance on this specific issue is the Regular Grievance Keystone signed on October 8, 2013 – ROSP-13-REG-01253. (Messer Affidavit at 6.)

*II. Analysis*

With regard to a motion for summary judgment, the standard for review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore, Ky.,* 93 F.3d 230, 233 (6th Cir. 1996). When a motion for summary judgment is made and is properly supported by affidavits, depositions or answers to interrogatories, the nonmoving party may not rest on the mere allegations or denials of the pleadings. *See Oliver v. Va. Dep't of Corrs.,* 2010 WL 1417833, at *2 (W.D. Va. Apr. 6, 2010) (citing FED. R. CIV. P. 56(e)). Instead, the nonmoving party must respond by

12

affidavits or otherwise and present specific facts from which a jury could reasonably find for either side. *See Anderson*, 477 U.S. at 256-57.

The Prison Litigation Reform Act of 1995, ("PLRA"), requires a prisoner to exhaust any available administrative remedies before challenging prison conditions in federal court. *See* 42 U.S.C.A. § 1997e(a) (West 2012). It provides as follows: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C.A. § 1997e(a). Exhaustion is mandatory under § 1997e(a), and courts have no discretion to waive the requirement. *See Woodford v. Ngo*, 548 U.S. 81, 85 (2006) (citing *Booth v. Churner*, 532 U.S. 731, 739 (2001)). A prisoner must exhaust administrative remedies even where the relief sought, such as monetary damages, cannot be granted by the administrative process. *See Woodford*, 548 U.S. at 85 (citing *Booth*, 532 U.S. at 734). Proper exhaustion of administrative remedies for PLRA purposes means using all steps that the agency holds out, and doing so properly, so that the agency addresses the issues on the merits. *See Woodford*, 548 U.S. at 90. Therefore, before Keystone may proceed with his claims in this court, he must first have exhausted the administrative remedies available to him through the VDOC. "[F]ailure to exhaust is an affirmative defense under the PLRA" and, therefore, must be both pled and proven by the defendants. *Jones v. Bock*, 549 U.S. 199, 206 (2007).

Here, the defendants have asserted this affirmative defense in their respective answers and have supported their argument on this ground through an affidavit from Messer, the Institutional Grievance Coordinator at Red Onion, as well as with copies of Keystone's relevant grievances. As set forth in detail above,

13

the VDOC has a grievance procedure for inmates who seek to challenge their conditions of confinement. A review of Keystone's grievance file at Red Onion revealed that he has properly filed and exhausted only two grievances relevant to his pending § 1983 claims against the defendants. First, in Regular Grievance ROSP-13-REG-01175, dated September 11, 2013, he claimed that he suffered headaches and aggravation of his health conditions after being moved into the C2 Housing Unit in August 2013, which smelled bad due to inmates not bathing and the showers not being cleaned. The other grievance properly filed and exhausted by Keystone was Regular Grievance ROSP-13-REG-01253, dated October 10, 2013, in which he complained of an incident of alleged excessive use of OC spray without turning on the exhaust fans to properly ventilate the area, and which resulted in an aggravation of his health condition.

It is well-settled that no federal statute of limitations applies in § 1983 actions. *See Shelton v. Angelone*, 148 F. Supp. 2d 670, 676 (W.D. Va. 2001). Instead, Title 42 U.S.C. § 1988 authorizes courts addressing actions under the Civil Rights Act to borrow limitations provisions under state law if application of such statutes is consistent with federal law. *See Shelton*, 148 F. Supp. 2d at 676. The Supreme Court held in *Wilson v. Garcia*, 471 U.S. 261, 280 (1985), that "§ 1988 requires courts to borrow and apply to all § 1983 claims the one most analogous state statute of limitations." *Owens v. Okure*, 488 U.S. 235, 240 (1989) (citing *Wilson*, 471 U.S. at 275). The Court further found that, because § 1983 claims are best characterized as "personal injury actions," a state's statute of limitations for personal injury actions should be applied to all § 1983 claims. *Wilson*, 471 U.S. at 280. In states that have more than one statute of limitations applicable to personal injury actions, "courts considering § 1983 claims should borrow the general or residual statute [of limitations] for personal injury actions." *Owens*, 488 U.S. at

14

250. Virginia has a "general or residual statute for personal injury actions," found at Virginia Code Annotated § 8.01-243(A), which states as follows:

> Unless otherwise provided in this section or by other statute, every action for personal injuries, whatever the theory of recovery, and every action for damages resulting from fraud, shall be brought within two years after the cause of action accrues.

VA. CODE ANN. § 8.01-243(A) (2015 Repl. Vol. & 2016 Supp.). Therefore, the court must apply the two-year limitations period set forth in § 8.01-243(A) to all § 1983 actions arising in Virginia. *See Shelton*, 148 F. Supp. 2d at 677. Here, Keystone filed this action on October 13, 2015.[6] Therefore, to avoid being barred by the statute of limitation, Keystone's causes of action must have accrued no earlier than October 13, 2013.

While the statute of limitations is borrowed from state law, the question of when a cause of action accrues under § 1983 remains a question of federal law. *See Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995) (en banc). A cause of action under § 1983 accrues and the statute of limitations begins running when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action. *See United States v. Kubrick*, 444 U.S. 111 (1979); *see also Battle v. Seibels Bruce Ins. Co.*, 288 F.3d 596, 604 (4th Cir. 2002). Keystone undoubtedly possessed such sufficient facts at

---

[6] Keystone's Complaint is dated October 13, 2015, the envelope in which it was mailed is postmarked October 14, 2015, and this court received the Complaint on October 16, 2015. Under the prison mailbox rule, Keystone's Complaint is considered filed on the day it is delivered to prison authorities for forwarding to the court clerk. *See Houston v. Lack*, 487 U.S. 266, 276 (1988). Here, Keystone noted on the Complaint that it was mailed on October 13, 2015. Thus, this is the date it is deemed filed with this court. The undersigned further notes that, even if Keystone's Complaint were deemed filed on October 14 or October 16, 2015, the end result in this case would be unchanged.

15

least by September 11, 2013, and October 10, 2013, concerning the air quality in the C Building and the alleged excessive use of OC spray without proper ventilation, respectively, as these were the dates of his grievances related to these issues. The undisputed evidence further demonstrates that Keystone did not file this action until October 13, 2015. Therefore, Keystone did not file these claims within two years of the date of accrual, and these claims are barred by the statute of limitations. The court notes that Keystone also alleges in his Complaint that his health conditions were aggravated by cigarette smoke coming from the Progressive Housing Unit. While the defendants also argue that Keystone did not properly exhaust his administrative remedies as to this claim, it, too, would be barred by the statute of limitations, in that Keystone concedes that the VDOC banned smoking in 2010.

In his Complaint, Keystone mentions four other regular grievances he filed that he alleges are relevant to his claims. The first of these is 620-24320, which was submitted on October 17, 2006. (Docket Item No. 4 at 35.) In this grievance, Keystone complained that he was placed in Cell C305 on September 26, 2006, and it had feces in the cell door crack, the window and the vent. He requested to be moved out of the cell or have it professionally cleaned, as it smelled badly and was unsanitary. Keystone appealed the decision and received a Level I response on November 6, 2006, from the Warden. (Docket Item No. 4 at 34.) The Warden deemed the grievance unfounded. Keystone told Lt. Younce that he had cleaned the feces, but no merit was found to his allegation. Keystone appealed to Level II and received a response from L.W. Huffman, the Regional Director, on November 27, 2006. (Docket Item No. 4 at 33.) Huffman upheld the Level I decision, noting that investigation revealed no evidence to support Keystone's allegations of being placed into an unsanitary and unclean cell. Thus, the undisputed evidence

16

demonstrates that Keystone exhausted his administrative remedies on this issue, but it also shows that he did not file his Complaint until approximately nine years later, far outside of the applicable limitations period. Therefore, he is barred from raising any claims regarding this incident.

The next grievance Keystone references in his Complaint is 620-27850, which was filed on June 26, 2008. (Docket Item No. 4 at 40.) In this grievance, Keystone claimed that the shower vents were not pulling out air properly and that hot/steamy air was flowing into the pod. He claimed that a work order had been submitted three to four weeks previously. He requested that this problem be fixed in the near future. Again, Keystone appealed to Level I. (Docket Item No. 4 at 39.) On July 22, 2008, the Warden responded, finding the grievance unfounded. Keystone, thereafter, appealed this decision to Level II, and on August 5, 2008, Huffman upheld the Level I decision. (Docket Item No. 4 at 38.) Thus, again, while Keystone arguably exhausted his administrative remedies on this issue,[7] the Complaint was not filed until October 13, 2015, far past the statute of limitations period for this claim.

The third grievance cited by Keystone in his Complaint is 620-25982, filed on August 23, 2007. (Docket Item No. 4 at 47.) At that time, Keystone was housed in Cell B321. In this grievance, Keystone stated that smoke was coming through his vents constantly from the Progressive Housing Unit next door, aggravating his COPD, with symptoms of difficulty breathing, headaches, nausea and chest pains. He requested that the problem be fixed or that he be moved to a different pod. Keystone has not provided the court with any evidence that this regular grievance was appealed to Level I. Therefore, any claims based on this

---

[7] Grievance 620-27850 related to improperly working fans in the D Building at ROSP.

issue are barred by his failure to exhaust his administrative remedies. The court further notes that this issue relates to the B Building, not the C Building, and, therefore, is not relevant to his pending litigation. Also, since his Complaint was not filed until more than eight years later, this claim would be barred by the statute of limitations.

Lastly, Keystone references Regular Grievance 620-25833, dated July 28, 2007. (Docket Item No. 4 at 20.) In this grievance, Keystone complained of it taking two weeks to fix a ventilation problem in the B321 area. He stated that his COPD was aggravated, and he suffered from shortness of breath and chest pains. In the Level I response by the Warden, dated August 27, 2007, Keystone's grievance was deemed unfounded. (Docket Item No. 4 at 18.) Keystone appealed this finding to Level II, and on September 5, 2007, Regional Director Huffman upheld the Level I finding. (Docket Item No. 4 at 17.) Therefore, although Keystone exhausted this issue, it did not relate to the C Building, and he is barred from raising this issue in his Complaint, filed nearly eight years later.

The court notes that, insofar as Keystone attempts to raise any claims not addressed in his properly exhausted grievances, discussed herein, they are barred by his failure to exhaust administrative remedies. Lastly, the court notes that the defendants argued that they are entitled to entry of summary judgment in their favor on grounds other than those discussed herein. However, given the undersigned's findings and recommendations, the court finds it unnecessary to discuss such alternative grounds.

18

For all of the reasons stated herein, I recommend that the court grant the Motion and enter summary judgment in the defendants' favor on Keystone's § 1983 claims.

## PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Keystone filed his Complaint in this case on October 13, 2015;
2. The applicable statute of limitations period for Keystone's § 1983 claims against the defendants is two years;
3. Therefore, Keystone's causes of action must have accrued no earlier than October 13, 2013;
4. There is no genuine dispute in material fact that the only claims properly exhausted by Keystone accrued earlier than October 13, 2013; and
5. Keystone's claims are barred by the statute of limitations.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court grant the Motion and enter summary judgment in favor of all of the defendants on Keystone's § 1983 deliberate indifference claims.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as

provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Norman K. Moon, Senior United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

DATED: November 16, 2016.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

20

Case 7:15-cv-00553-NKM-PMS   Document 92   Filed 11/16/16   Page 20 of 20   Pageid#: 963